LEWIS E. MALLORY, III, v. JAMES EDGAR

175 So. 863.

Division A.

Opinion Filed July 20, 1937.

*Wm. J. Dunn, John M. Murrell* and *S. Whitehurst's Sons,* for Plaintiff in Error;

*Fred Botts* and *Botts & Field,* for Defendant in Error.

PER CURIAM.—In an action brought by the husband to recover damages for alienation of affection of his wife by the defendant there was judgment for $35,000.00. The defendant took writ of error and assigned as errors, (1) the final judgment as rendered; (2) the denial of a motion for new trial. There are sixty (60) grounds of motion for new trial. One of the grounds of the motion for new trial is predicated upon the following as reflected by the bill of exceptions. During the course of the argument of the merits of the cause by counsel for the plaintiff, the following occurred:

"Mr. Botts: Not long ago Mr. Murrell got a verdict of $45,000.00 in this court in an alienation suit.

"Mr. Murrell: Explain to them that I represented the girl against her father and mother-in-law, and not a man.

"The Court: Be at ease for five minutes. (Thereupon a short recess was taken.)

"Mr. Murrell: I want to ask the Court to instruct the jury to disregard the statement about any other suit mentioned wherein a verdict of $45,000.00 was rendered, and state that such remark has nothing to do with the issues involved in this case and they should not consider such remark.

"The Court: I will deny the motion."

To which the defendant did then and there except.

"Mr. Murrell: We also renew all motions for mistrial heretofore made, on the grounds previously stated, on account of the conduct of plaintiff's counsel in said cause.

"The Court: Motion denied.

"Mr. Murrell: Exception."

Counsel for plaintiff objects "to including within the bill of exceptions as presented to the Court for authentication the above quoted remarks of counsel for plaintiff" * * * upon the ground, among others, that such quoted remarks were "only a fragmentary portion of the remarks of counsel for plaintiff in that connection, and that in making said remarks counsel for plaintiff referred specifically to the remarks of counsel for defendant, above mentioned, and stated, among other things, that Mr. Murrell did not think that alienation suits were so disgraceful and objectionable a short time ago when, not so long ago, Mr. Murrell got a verdict of $45,000.00 in this court in an alienation suit."

As the Court overruled the stated objection to the bill of exceptions, it must be assumed here that the bill of exceptions correctly states what were the facts he ruled on when he denied the motion of defendant's counsel that the Court "instruct the jury to disregard the statement about any other suit mentioned wherein a verdict of $45,000.00 was rendered, and state that such remark has nothing to do with the issues involved in this case and they should not consider such remark."

On the record here, the denial of the motion that the jury be instructed by the court to disregard the statement about any other suit mentioned wherein a verdict of $45,000.00 was rendered was error. It was irrelevant matter calculated to influence the minds of the jury at least as to the amount of damages to be awarded. See: Blackwell v. State, 76 Fla. 124, 79 Sou. Rep. 731, 1

A. L. R. 502; Seaboard Air Line Ry. Co. v. Smith, 53 Fla. 375, 43 Sou. Rep. 235; Akin v. State, 86 Fla. 564, 98 Sou. Rep. 609.

In cases of this nature the courts should exert great care to exclude all irrelevant matters that might influence the jury in order that each such case be decided on its particular relevant facts and the principles and provisions of law applicable thereto.

During the progress of the trial a certain card on which was written: "Darling never forget I have loved all there is and never forget I still love you all thére is. Lew." was introduced in evidence over the objection of the defendant without proof that the language used on the card was written by the defendant or by his authority. If it was written in the language used by the defendant or by and with his authority, such fact was susceptible of proof and such proof should have been required before the card should have been admitted in evidence over the objection of defendant. This is true because the value of the card as evidence lay in the character and meaning of the language used thereon.

The record presents a most amazing set of alleged facts upon which the plaintiff relied for recovery.

There is in the record evidence which tends to establish the following salient facts: Plaintiff was married to an actress known as Miss Kathryn Crawford. The marital relations were neither congenial or happy. Plaintiff was a gambler of considerable means and was connected with gambling operations. He was high tempered and impetuous. His wife was a woman of culture and refinement, possessed an untarnished character and reputation, was of a highly nervous and sensitive temperament. Edgar and his wife had many quarrels and misunderstandings. In February or March, 1935, they had an altercation in their

apartment in Detroit in which Edgar beat his wife up, bruised and injured her so that she was confined in a hospital for a period of about three weeks. The result was that she then ceased to have any affection for her husband and from that time on contemplated and discussed divorcing him on account of his cruelty to her. She did, however, continue to live with him and treat him as her husband and they continued to quarrel and make life unpleasant for each other. In the winter season of 1936 Mrs. Edgar went to Miami with a young lady friend and there she, about February 29th, met Mr. Mallory, a wealthy young man against whom no previous dishonorable conduct is shown by the record. Mr. Edgar arrived in Miami about February 29th, and Mallory met him on March 2nd.

Mrs. Edgar and Mr. Mallory were thrown together in the company of mutual friennds between March 1st and 3rd, when she went with her husband to Havana, Cuba, and once or twice after her return from Cuba on March 7th, and before March 12th, when she went to the hospital. The record discloses the indulgence of no misconduct on the part of either of them from the lips of any of their friends or associates.

Several employees of the hotel where Mallory lived testified that they each saw Mrs. Edgar in Mr. Mallory's bedroom at late hours of the night in compromising positions with each other, and one or two testified that they saw these parties in the act of sexual intercourse in that room, both being nude, having an electric light burning in the room on the ground floor with windows up and curtains or draperies not drawn. The testimony of these witnesses was conflicting as to what was seen and at the times when some of these witnesses purported to have observed these amours Mrs. Edgar was in Cuba with her husband. The story told by these witnesses is contrary to reason and prob-

ability. It portrays the conduct of a brazen and abandoned harlot, not that of a refined woman being seduced by an ardent lover of less than a week's acquaintance. It may be that these witnesses each thought they were respectively speaking the truth, but the admitted surrounding circumstances were such that they could have been entirely mistaken as to the identity of the woman they saw in Mallory's room. Edgar testified that by accident as it were he happened to approach outside of Mallory's room at a late hour one night, heard his wife's voice and following the sound of the voice he, too, looked through that open window and observed Mallory and Mrs. Edgar both nude on Mallory's bed, but did not make his presence known to either and did not afterwards mention the matter to either of them, although he talked to both about being in love with one another, which accusation they both denied.

After the alleged occurrence above stated, Edgar was present when his wife opened a box of flowers which Mallory had ordered sent to her. They had a quarrel about that, which was followed up by a quarrel about the possession of a key to Mrs. Edgar's automobile in which Mrs. Edgar says her husband struck her across the back in the lobby of a swanky hotel. In this she was corroborated and the result was a doctor was called and Mrs. Edgar was taken to a hospital and declared she was through with plaintiff. In the meantime, Mallory had gone to Winter Park to attend the marriage of a friend. About the time Mallory arrived in Winter Park he received a telegram reading:

"Mar. 12, 1936.
"To Mr. Lew Mallory, III,          "DV2—66 DL.
"c/o L. C. McKinney,
"Palmer Ave., Winter Park, Florida.

"Nothing worth while without you my Dear Stop I adore you with every fiber of my soul Stop Your flowers Darling

Stop Would they could bloom forever as will the memory of the thought that prompted you to send them Stop I will pray every minute you are away that you will come back free of heart and mind Stop Such is my love for you.

"Kathryn."

Mallory testified that he knew no reason for the sending of such telegram and thought it some sort of a joke. Mrs. Edgar testified that she wrote and sent the telegram in the presence of and with the knowledge of her husband because of his conduct about the box of flowers and purely to spite him and not because of any feeling of affection for Mallory. Edgar denied that he saw the telegram written, but says he became cognizant of it by finding an unsigned copy of it in Mrs. Edgar's room after she was taken to the hospital. Shortly after Mallory received the telegram he had a phone call from Edgar. His testimony as to that and what immediately followed is:

"* * *

"Q. Will you please relate that conversation that you had with Mr. Edgar?

"A. I cannot exactly. I can tell you the gist of it.

"Q. As best as you can recall it.

"A. Well, the first thing he said was, 'Is this you, Lou?'

"Q. Said what?

"A. 'Is this you, Lou?' And I was rather surprised, because I had only met him once and talked to him half an hour or so, and I said, 'Yes.' He said, 'This is Jamie Edgar'. He said, 'Kitty is in the hospital.' Well, I was shocked to hear that, and expressed my sympathy, and said I was sorry to hear that; and I asked what was wrong with her, and he said, 'She is on the verge of a nervous breakdown.' So I again said something that I was sorry to hear that. And then he burst out and he said, 'Are you in love

with her?' And it took me so much by surprise, I could not answer for a second. He said, 'If you are, I think you ought to come down here and marry her.' He said, 'I will give her a divorce.' Well,. I. didn't know what to say. I still did not know whether it was a joke or whether he was crazy, or what was the matter; and I said, 'Are you nuts?' He said, 'No.' He said, 'I think you ought to come down and marry the girl.' Well, I didn't know what in the world was going on, and I thought it was possibly a joke, so I said, 'Well, I cannot talk to him,' and I hung up. Oh, I promised I would call him back the next morning.

"Q. You promised to call him back?" * * *

"Q. (By Mr. Murrell): Now, Mr. Mallory, will you please state what happened after that in reference to you and Mr. Edgar; did you hear from him any more, or see him?

"A. Yes, yes, I did. That night we laughed about it for a while, and the next morning, or rather I would say around noon sometime, I went across the street to the hotel, and they had a coin booth there, and I called him up, and at that time he asked me again—no, this time he said, 'Won't you come down here and marry her?" And I said, 'You must be crazy. I could not marry your wife. I am not in love with her, and have no intention of marrying her at all.' And I could not understand what he was talking about or getting at. By this time I realized that it was really he, and I thought he must be crazy.

"Q. You had called for him on the phone?

"A. Yes.

"Q. And you recognized the same voice as the voice who had called you the previous day?

"A. That is correct.

"Q. Then you knew it was Edgar talking?

"A. Yes.

"Q. Now, please go ahead and state.

"A. Well, he said something about, 'Will you please call Kitty in the St. Francis Hospital and talk to her?' And I said, 'Yes, I will be glad to, if you want me to.' And he said, 'I wish you would. I wish you would call her up and talk to her.'

"Q. Did you call her?

"A. I did.

"Q. Did you talk to her?

"A. I am not sure whether I got her at that time or not. If I remember correctly, the line was busy or she was asleep or something, and I had to call back again later. So finally, at any rate, I got her on the phone, and I could scarcely hear her voice; it was very weak, and she seemed very incoherent. I could not make any sense out of what she was talking about, and right in the middle of the conversation he broke in and said, 'Thanks very much for calling. I appreciate it.' And thanked me again, and then we hung up. Oh, he asked me to come down on Sunday. I told him it was impossible for me to come down on Sunday, and he said, 'When you come down give me a ring at the Embassy Hotel. I would like to have you come over and talk to Kitty.'

"Q. Did you go down to Miami?

"A. Yes; I come down, but I saw him before that.

"Q. Go ahead.

"A. I told him I would be glad to come down, if he was having trouble, and patch things up. So I think it was that night there was a pre-wedding party given at the Country Club up there at Winter Park, and about one o'clock in the morning the party was breaking up, and we were getting ready to leave, when the phone rang, and they called me to the telephone, and he said, 'I am over at the Virginia Inn.'

That is where I was staying. He said, 'I would like to talk to you. I won't bother you very long, about five minutes is all I need. Will you come over? I said, 'Sure, I will be glad to come over.' So Mr. Bovaird rode over in my car, and when we got there, he was standing out in a little park with a chap whom I recognized as being an airplane pilot, whom I knew. Mr. Bovaird and Mr. O'Hara, the airplane pilot, went outside, and Mr. Edgar and I went up on the porch. There was a line of rocking chairs up there, and we sat down and he told me the same things he told me the night before, and I answered him in the same way, that we talked about on the phone. I suppose we talked about ten minutes or so, and he said, 'All right. I will see you when you come down on Sunday.' And I promised I would give him a ring. I got in my car and drove away, and I presume he left, too.

"Q. Did you come to Miami?

"A. Yes, on Sunday afternoon I drove down. I think I came into Miami about 8 or 9 o'clock that night.

"Q. Sunday evening?

"A. Sunday evening, the 15th.

"Q. When you arrived here, did you see Edgar?

"A. I called him at the Embassy. I phoned, and he said, 'Yes, I would like to have you go and talk to Kitty.' * * *

"Q. Then you went over and talked to Mrs. Edgar, you say?

"A. Yes.

"Q. In the presence of her sister?

"A. Well, her sister and the nurses were in and out of the room a number of times.

"Q. Did you ask her anything about this, or tell what had happened?

"A. Well, the first thing I asked was, 'What does this telegram mean?' And she went on to explain to

me why she had sent it, and she told me substantially that she had had some sort of trouble with her husband, and it had been going on for some time; that they had not been getting along at all, and that she was going to leave him, and that during one of their fights or arguments she wrote out this telegram and sent it to me." * * *

"Q. Then after you left the hospital what did you do?

"A. I went back over to my room and while I was there—let me get this straight—I think I stopped in the office first, and then went to my room, and Mr. Edgar called me on the telephone, and he said something like this. He said, 'Did you go over and see her?' I told him I had, and he thanked me for it. And he said, 'I would like to see you down here at the Embassy.' I said, 'What for?' He said, 'Never mind. I think you will be interested, and it will be worth your while to come down.' He said, 'If anybody serves you any papers on the way down here, don't pay any attention to them.' Well, that frightened me. I did not know what was up then. Oh, yes. He mentioned, he said, 'I have got an affidavit from a night watchman up there.' I said, 'To what effect?' He said, 'To the effect that he has been looking in the window and seen you in there with my wife in your room.' I said, 'That is impossible.' He said, 'Come on down here and talk.' So I went up to the pool and Mr. McGovern, the head house detective, was standing by the pool, and I asked him if any of the men had been giving any affidavits, and he said, 'Absolutely not.' He called Holstrunk up there at that time. May I say what Holstrunk said?" * * *

All this was corroborated by Mr. Edgar and Mr. Edgar testified that he never mentioned to Mallory anything about having seen Mrs. Edgar in Mallory's room. Soon after Mrs. Edgar left the hospital she and Edgar resumed their marital relations and with Mrs. Edgar's sister returned to

Detroit. Stopping in Jacksonville the first night out from Miami, Mr. and Mrs. Edgar slept together as husband and wife in a hotel there. After they reached Detroit Mrs. Edgar finally determined to prosecute divorce proceedings on the ground of extreme cruelty inflicted upon her by her husband. Her suit was filed and process served on the 7th day of April, 1936. Final decree granting divorce on proof of allegations of the bill of complaint was entered by the Honorable Allen Campbell, Circuit Judge, after a property settlement had been reached between the parties whereby Mrs. Edgar received $15,000.00 in cash and a note for $3,000.00.

To say the least, this was an unusual sort of settlement for a wronged and faultless husband to make with a wife known to him to have been guilty of adultery and whose alleged infidelity he intended shortly to expose in the process of a public trial in a suit against her alleged paramour.

There is evidence in the record which if believed by the jury, warrants the returning of a verdict against the defendant on the counts of the declaration charging that defendant did debauch and carnally know plaintiff's wife, but to have arrived at that conclusion in the light of all the record the credulity of the jury must have been severely strained.

The great weight, a preponderance of the evidence, shows that Mrs. Edgar had ceased to love or have any affection for plaintiff long before she met Mallory and that such condition resulted from the conduct of plaintiff toward his wife and their mutual lack of congeniality.

Upon the whole record we must hold that the verdict and judgment was grossly excessive.

The record bristles with verbal passages at arms between counsel for the respective parties which might well have influenced the jury improperly and which should neither

824

be indulged in by attorneys in the trial of a cause nor should the indulgence therein be allowed by the trial court. Discourtesies and personal tilts between attorneys at the bar of a court should ever be studiously avoided.

For the reasons stated, the judgment is reversed and the cause remanded for a new trial.

So ordered.

ELLIS, C. J., and TERRELL, BROWN and BUFORD, J. J., concur in the reversal.

ELLIS, C. J., and BROWN, J., filed separate special concurring opinions.

Mr. Justice DAVIS had prepared a special concurring opinion, which is appended.

DAVIS, J. (specially concurring in result).—I agree to the award of a new trial in this case solely because of circumstances shown to have transpired that apparently caused the jury to act on consideration outside of the evidence in fixing the amount of damages allowed in this case, particularly the knowledge that was brought to the jury's attention of other verdicts returned in the lower court in earlier cases awarding higher amounts.

The common law holds high regard for the conservation of the marriage relation, not alone for the benefit of the parties themselves, but for the *State* whose citizenship is affected adversely by acts and doings having a tendency to destroy the marital relation or impair its usefulness. Accordingly, the common law authorizes a husband to maintain an action against a third person for criminal conversation with his wife, her consent to the illicit relationship in no way affecting the husband's right to the action. The essential injury to the husband in such action is deemed to consist of the defilement of the marriage bed in the invasion of the husband's exclusive right to marital

intercourse with his wife, and particularly to beget his own children. The loss of consortium and of comfort in the wife's society are but elements of the general damage inflicted upon the husband and upon society as a whole, when a third person either induces a wife to violate her conjugal duties *or aids, assists or abets her in so doing* when she is voluntarily thus inclined. The alienation of affections in a case *where criminal conversation with the wife is established,* is consequently relegated to a position of secondary importance by being regarded in law as a mere matter of aggravation. Evans v. O'Connor, 174 Mass. 287, 54 N. E. Rep. 557, 75 A. S. R. 316.

In cases not involving criminal conversation with the wife the gravamen is the alienation of the wife's affections from malice or other improper motives, and the injury is principally one of induced loss or impairment of consortium usually accompanied by a deprivation to the husband of the wife's society and assistance, rather than an actual invasion of the marital sanctity itself.

An action for criminal conversation is essentially one for trespass *vi et armis* and draws to it the application of all the rules of law usually applicable to such class of tort actions. Thus, the wife's consent to the act will not be allowed as a defense any more than the wife's consent would excuse an assault and battery on her person resulting in a loss to the husband of his wife's services or society. Nor is it any defense, except as affecting the damages, that the husband injured by an act of criminal conversation with his wife on the part of a third person, had, prior to the defendant's wrongful act, completely lost the affections of his wife even by his own misconduct or ill treatment of her. Dallas v. Sellers, 17 Ind. 479, 79 Am. Dec. 489; Gross v. Grant, 62 N. H. 675, 13 A. S. R. 607; Lewis v. Roby, 79 Vt. 487, 65 Atl. Rep. 524, 118 A. S. R. 984.

Nor is it any justification to a suit for criminal conversation that the husband has himself been guilty of illicit intercourse with other women, nor can the action be defended on the ground that the plaintiff husband is a dissolute character. Matusak v. Jilczewski, 295 Pa. 208, 145 Atl. Rep. 94, 68 A. L. R. 557, and note. So much is the protection of the law extended to the preservation of the marital bed from defilement by acts of criminal conversation that it has been held that an agreement by a husband injured by such an offense to settle a claim against the guilty party under a covenant that the husband will do nothing whereby the matter will acquire any publicity whatever, has been held to be against public policy. McKenzie v. Lynch, 167 Mich. 583, 133 N. W. Rep. 490, Ann. Cas. 1913A 704, 36 L. R. A. and note.

As will be seen from a review of the precedents the right to sue for criminal conversation is an action of ancient common law origin, and is designed as much, if not more, to discourage such conduct on the offender's part in the conservation of the public interest, as it is to indemnify the wronged husband for the violation of his right to consortium, loss of services, injury to social position by being publicly identified as a cuckold, impairment of family honor or mental suffering. Indeed, the offense, when committed, is against the family and the State, as much as a private wrong to the outraged husband, and for this reason, it has been universally held that many of the excuses which will support a defense to an action for alienation of affections alone, will have no influence as a justification *in a criminal conversation suit*.

In Vanvaks v. Chantly, 107 Fla. 647, 145 Sou. Rep. 838, Chantly sued Banvaks for alienation of his wife's affections and for criminal conversation with her. The judgment for $25,000.00 damages rendered the husband in that case was

affirmed without serious debate among the Justices of this Court, mainly because of the element of criminal conversation established on defendant's part as a basis for the recovery there awarded. A *precis* of that case would be that where an adventurous marauder of wifely affections mistakes adultery for chivalry, he should expect to assume the cost of his intrepreneurship in amorous dilettantism by paying the price of the tunes he may have piped for his personal gratification.

The record in this case presents a state of facts all too commonly observed nowadays in a godless age where Sybaritic pleasure appears to be the principal indoor sports of the vacationing playboy of wealth and position while luxuriating away his hours in a balmy clime noted for its conduciveness to enjoyment of pleasures of the flesh as well as of the spirit. That fact, however, does not alter the application of long established rules of law which in the course of their administration operate to restrain if not entirely inhibit acts of criminal conversation with other men's wives that are likely to be productive of violence and disorder as well as subversive of general family integrity, whatever the sexual propensities or looseness of the wife may be.

. Long prior to the adoption of the Constitution there was an established right of action in cases of criminal conversation and Section 4 of the Bill of Rights protects the injured spouse in the assertion of a legal right to redress for the injury done. Necessarily all such actions are of a bizarre nature, but, like prosecutions for crime, they serve to furnish a forum for the infliction of punishment in the form of civil damages for a wrong that in the Southland is usually only brought to court when the outraged husband is tried for the homicide of his wife's paramour.

I concur in the conclusion to reverse the judgment for a new trial on the first assignment of error.

828

Ellis, C. J. (concurring in part).—When an appellate court reverses a judgment because counsel for one of the parties makes a statement in his argument before the jury which is considered to have diverted the attention of the jury to the consideration of matters which do not lie within the scope of the evidence on which the jury is sworn to try the case, it is because, first: the statement as made is of such a nature as to have that effect; and secondly, that the trial judge, upon proper motion made to instruct the jury to disregard the same, abuses his discretion by either overruling the motion or failing to give such instruction to the jury as would effectively eliminate from their consideration the subject matter of such statement.

The question whether the objectionable statement in the circumstances in which it was made is of such character as to unduly influence the jury while considering their verdict is a matter addressed to the discretion of the trial judge subject only to review by an appellate court when it is made to appear that the trial judge abused that discretion.

The reasonable discretion in such matter vested in the trial judge arises from the very nature of the proceedings in which the judge sees the witnesses, hears their testimony, observes their demeanor and listens to the argument of counsel. If a statement is made in argument which is not justified by any fair and reasonable interpretation of the evidence but is a gratuitous statement injecting into the controversy matter which is irrelevant but nevertheless prejudicial in character in that it is designed to arouse the prejudice or antagonism of the jury against the opposite party to the controversy it may be said to be an abuse of legitimate argument and an unfair advantage to take against the adverse party.

In order for an appellate court to determine whether such an unjustifiable statement has been made in argument or

whether the trial judge abused his discretion in refusing by his charge to effectively remove such statement from consideration by the jury, it is necessary that the appellate court should have before it all the circumstances out of which the questionable statement arose because the discretion of the trial judge necessarily rests upon the circumstances or incidents occurring at the trial which may reasonably be considered as being the occasion for the questionable statement. Therefore the appellate court should consider the objectionable statement in the light of the circumstances in which it was made that it might determine whether the complaining party had made it to appear that the trial judge had abused his discretion in refusing, upon a proper motion, to eliminate the questionable statement from consideration by the jury.

Now the record in this case discloses that the objectionable statement, as complained of in the complete assignments of error, was as follows: "Not so long ago Mr. Murrell (defendant's counsel) got a verdict of $45,000.00 in this court in an alienation suit." It is contended by counsel for plaintiff in error that such statement "constituted gross misconduct, was improper and highly prejudicial to the defendant, and was done solely for the purpose of poisoning the minds of the jury and to place in said Jurors' minds an amount of damages allowed in another case which plaintiff's counsel well knew was not a case similar to the case at bar, and even if said mentioned case had been a similar case, it would have been highly prejudicial to the defendant for plaintiff's counsel to make such remarks in his argument to the jury."

Now the record discloses that while the plaintiff's counsel did make such statement it was by way of retort to an equally prejudicial and improper argument by defendant's counsel in which he said:

"Suits for alienation of affection were held in disrepute, and that many of the states had, by law, prohibited the maintenance of such suits. That such suits were, in any instance, only a species of blackmail; that the suit in question was scandalous and disgraceful and nothing more than an attempt on the part of the plaintiff to commercialize on the body of his wife. That the plaintiff, in the attitude which he had taken in maintaining this suit and thereby attempting to commercialize on the body of his wife, was nothing more than a glorified pimp."

In reply to that statement plaintiff's counsel retorted by the statement above referred to as objectionable and made the basis of the first assignment of error.

The statement made by defendant's counsel, that actions of this character are held in disrepute and that the plaintiff sought in this prosecution to commercialize on the body of his wife and thereby became a mere "glorified pimp," was not justified either in point of law or from the evidence which was adduced before the jury in this case, according to which they were sworn to try the issues joined. The statement apparently was designed to disclose the attorney's attitude toward such character of cases as actions for damages for the alienation of affection as being immoral, disreputable and repugnant to the normal sense of honor and masculine virility of jurors who under the law are chosen because they are good men and true and of approved intelligence. The retort by the plaintiff's counsel was designed to impeach that moral attitude of defendant's counsel by showing that, a short time before, the same counsel had brought an action of that character and obtained a judgment in the sum of $45,000.00 against the delinquent party. The record discloses that the defendant's counsel rejoined as follows: "Explain to them that I represented the girl against her father and mother-in-law, and not a man."

It may be true, as counsel for the defendant seems to maintain, that in the moral aspect there is one kind of action for alienation of affections when brought by a man, and another kind when brought by a wife against her father-in-law and mother-in-law for the alienation of her husband's affections. However that may be, there seems to have been no occasion whatsoever for injecting into this case either by provocation, reply or rejoinder the moral quality of such actions. They are lawful, have existed since the days of the common law, obtain in this State in recognition of the right of the spouse, whether male or female, to seek damages for the tort committed by a third person in alienating the other's affection.

Counsel for the defendant moved the court, according to the bill of exceptions, "to instruct the jury to disregard the statement about any other suit mentioned wherein a verdict of $45,000.00 was rendered, and state that such remark has nothing to do with the issues involved in this case, and they should not consider such remark."

This motion the court denied. Such denial seems to me to have been a reasonable exercise of the court's discretion, first: because defendant's counsel committed the first error which provoked the retort from plaintiff's counsel; secondly, that the retort was justified in argument to attack the sincerity of defendant's counsel's protest against this character of action by showing that when he was differently situated with reference to the parties in another action he seemed to have had no such strict views as to the moral quality of such actions and thirdly, because the questionable remark in the circumstances could not have appeared in any other light to good men and true and of approved intelligence than as a verbal bout between counsel in which one sought to condemn the character of action and the other sought to show that such protest was not sincere.

Neither do I concur in the analysis of this case as made by Mr. Justice Davis in so far as he sums up the conduct of the defendant as an "interpreneurship in amorous dilettantism." If it is meant by that phrase that the defendant undertook to practice lascivious indulgences with plaintiff's wife by a seductive method of his own contrivance, I am constrained to say that the learned jurist's analysis of the facts does not justify such a conclusion, and if by the quoted phrase he means to imply that sexual indulgences between a man and woman is a fine art, I submit that it is not so regarded in the lists of accomplishments in polite or even semi-polite society.

If there was any seduction in this case, the record seems to disclose that it was of a Potiphar's wife character in which the defendant exhibited less of restraint than Joseph, and more of the weakness of the average man. Or it may have been a seduction of another type, such as that unintentionally practiced by Bath-sheba, the wife of Uriah the Hittite, upon David, whose amorous susceptibilities seem to have been of even greater degree than that of the defendant.

The exhibits in this case, in the form of pictures taken of the plaintiff's wife in a bathing suit, while not revealing a type of Venus-like voluptuousness, the defendant may nevertheless on other occasions have been attracted by her semi-concealed charms when engaged in the pleasures of the bath at Miami Beach. However that may be, I fail to discover in the record that the defendant artfully and designedly practiced salacious methods upon the plaintiff's wife to steal away her tender affections from her husband, from whom she seems to have had an estrangement sometime before she met the defendant.

While that fact does not destroy the plaintiff's right of action, the removal by the husband and wife of the golden quality of connubial bliss, which seems to be the adhesive element in the bond of matrimony, may be considered in

estimating the amount of damages which another man inflicts upon the husband by the mere fact of the physical invasion of the husband's premises.

In this view of the case I am constrained to believe that the judgment was excessive and the fee exacted by the jury from the defendant as mitigant to the plaintiff's feelings or balm to his wounded heart was excessive by a substantial sum.

BROWN, J. (concurring specially).—I concur in the reversal of the judgment tendered and in most of what has been said in the opinions which have been written in this case, but in so doing I do not think it is either necessary or appropriate to express or intimate any opinion as to the sufficiency of the evidence to show either the guilt or innocence of the defendant in the court below with reference to the very serious charges made against him (and incidentally against the former Mrs. Edgar) in the plaintiff's declaration, which charges were denied *in toto* by the defendant. The testimony was sharply in conflict on the issues of fact thus made up between the parties, and thus presented a jury question. If this case, after reversal and remandment, is tried again before another jury, nothing should be said by this Court which could be construed as a ruling by the Court on the weight or credibility of the evidence, either for or against either of the parties. It is, however, appropriate to consider whether the evidence preponderated so strongly in behalf of plaintiff that no other verdict could have been arrived at. In such cases, the errors complained of are usually deemed harmless errors. Such was not the case here. Both sides produced evidence sufficient, if believed by the jury, to sustain a verdict either for or against the plaintiff. It was mainly a question of the credibility of witnesses, which was purely a jury question. The jury should have been left free to fairly con-

sider and determine this question without any errors on the part of the court or any conduct on the part of counsel which tended to get the jury off the track and prejudicially influence their decision.

To fairly summarize or analyze all the evidence introduced by the respective parties, so as to do full justice to both, and to the former Mrs. Edgar, whose reputation is at stake in this case, would require an opinion of considerable length, which I deem unnecessary. The transcript comprises some 850 pages, legal cap, and it took this writer some hours to read it. In passing, we might observe that the excellent manner in which the transcript was prepared, and the highly efficient work of the shorthand reporter as exemplified by the report of the testimony embraced in the bill of exceptions, are entitled to favorable comment. Such efficiency in these respects is of great assistance to the reviewing court.

This was a hotly contested case, and, as too often occurs, in the heat of the contest and argument, many unfortunate remarks were made by distinguished counsel on both sides, which in calmer moments would not have been made, but which tended to prejudice a fair and impartial consideration of the case in the minds of the jurors. Furthermore, some of the questions propounded to witnesses by counsel for plaintiff, and objected to by counsel for defendant, which objections were overruled by the court and exceptions reserved, were not allowable under the rules of evidence, and their allowance by the trial court constituted error. The allowance of some of these questions was also complained of in the motion for new trial. See grounds 15 and 22 of said motion.

Furthermore, several of the charges given by the court unwittingly assumed as proven facts which were sharply disputed and as to which the evidence was in conflict.

I concur, therefore, in the opinion of the majority of the Court that the judgment below should be reversed and the case remanded for another trial.

TERRELL, J., concurs.